IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **M.D.** *et al.*, | : | |
| *Plaintiffs* | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **COLONIAL SCHOOL DISTRICT,** | : | **No. 20-2354** |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                                 MAY *13*, 2021

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*, is by and large a success story. The idea of the statute is to ensure that all students with disabilities have access to a free appropriate public education (FAPE). This requires collaboration among those with a vested interest in the child—namely, parents and schools. But the goal of a collaborative process is, at times, bogged down by a procedural thicket of interlocking statutory provisions and agency regulations. Sometimes the goal of providing a student a FAPE devolves into an adversarial process when parties let the perfect be the foil of the good.

M.D. is a 12-year old student entitled to special education under the IDEA, residing in the Colonial School District.[1] In 2016, she was considered eligible under the IDEA based on certain learning disabilities, including difficulty articulating herself and discomfort around others. Colonial prepared an Individualized Education Plan ("IEP") for her, and she attended a Colonial school for the 2016-17 year, where she received services under that IEP. Because M.D. appeared to be struggling, her parents enrolled her in private school for the next two years. Although she received various support services during that period, she also began to exhibit additional disabilities, including Selective Mutism, anxiety, and a language delay. Because her parents

---

[1]     M.D. was 12 years old and enrolled in sixth grade when her parents ("Parents") filed their motion for judgment on the administrative record in December 2020.

1

determined that she needed more intensive and targeted programming for her disabilities, they re-enrolled her in the Colonial district in April 2019 for a fall start. Once it was clear that Colonial would not propose an IEP before the school year started, Parents noticed their intent to enroll M.D. in a private school and filed a due process complaint.

On a stipulated factual record, an administrative hearing officer determined Colonial had not denied M.D. a FAPE for the 2019-20 school year.

As is permitted under the IDEA, Parents appeal the hearing officer's ruling. Parents contend that Colonial's delay in evaluating M.D. resulted in a substantive violation of the IDEA and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq*. Colonial disputes that Parents are entitled to relief because, Colonial argues, it first had to determine M.D.'s eligibility when she was re-enrolled in the district—notwithstanding the prior determination—and that it was still within the permissive statutory timeline to evaluate M.D.

The parties cross moved for judgment on the administrative record. The Court granted the parties' request to supplement the administrative record with, among other things, records from M.D.'s private school placement and statements from M.D.'s private school teacher and treating psychiatrist.

For the reasons described below, the Court (1) vacates in part the hearing officer's decision and the hearing officer's order in ODR File No. 23232/19-20AS, (2) grants in part Colonial's motion for judgment on the supplemental administrative record, and (3) grants in part M.D.'s and Parents' motion for judgment on the supplemental administrative record.

## STATUTORY FRAMEWORK

Special education law is a morass of federal statutes and implementing regulations, resulting in a confusing process for parents, schools, and courts to wade through. For that reason, the Court will begin with a brief overview of the IDEA and relevant provisions of the statute.

Under the IDEA, a state must provide a FAPE to eligible children with disabilities. 20 U.S.C. § 1412(a)(1). The state provides a FAPE via IEP, a written statement identifying the child's present performance levels, goals, and concrete steps to evaluate and track the child's progress. *Id.* §§ 1412(a)(4), 1414(d). The IDEA requires that the school district offer an IEP that is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 426 (3d Cir. 2013).

Each local educational agency (LEA) "shall" have in effect an IEP for each child with a disability *at the beginning of each school year*. 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R § 300.323(a). A child is first determined to be eligible under the IDEA when an initial evaluation so concludes. Pennsylvania's implementing regulations require the initial evaluation be conducted within 60 days of receiving written parental consent for the evaluation. 22 Pa. Code. § 14.123(b); *see also* 34 C.F.R. § 300.301(c)(1).

After this initial evaluation, a child is to be re-evaluated at least once every three years, unless both parents and the local agency determine it is unnecessary. 20 U.S.C. § 1414(a)(2)(A). The same 60-day timeline applies to complete a re-evaluation. 22 Pa. Code § 14.124(b); *see also* 34 C.F.R. § 300.303.

## SPECIFIC BACKGROUND

### I.    2016 IEP

From kindergarten through second grade, M.D. received her education at Whitemarsh Elementary School, her local in-district public school. Prior to starting second grade, M.D. was identified as having a disability. Doc. No. 10-7 (Joint Stipulation) ¶¶ 4-5. Colonial and M.D.'s parents developed an IEP in November 2016. *Id.* ¶ 6. The 2016 IEP provided weekly speech and

3

language therapy sessions. At the time the 2016 IEP was developed and implemented, M.D. had not yet been diagnosed with Selective Mutism.[2]

Because M.D. was struggling at Whitemarsh, Parents enrolled her at Springside Chestnut Hill Academy, a private school, for the 2017-18 school year. *Id.* ¶ 9. They placed her there at their own expense. M.D. attended Springside for third and fourth grade. *Id.* ¶ 11. While there, M.D. received speech and language therapy services from an outside provider. *Id.* ¶ 12. Towards the end of fourth grade, Parents determined that their daughter was still struggling at Springside and needed more intensive programming. Doc. No. 10-4 (Parents' Declaration) ¶ 10.

## II.   Re-enrollment in Colonial School District

On April 10, 2019, Parents re-enrolled M.D. in Colonial School District for the coming fall term and requested that Colonial provide her with an IEP. Joint Stipulation ¶ 13; Doc. No. 1-7 (Student Registration Form). In the registration form, Parents circled "yes" for IEP but did not circle anything for § 504 supports. Doc. No. 1-7. Parents followed up a week later asking about the status of the IEP, *id.* ¶ 15, and submitted a confidential psychoeducational report to Colonial about two weeks after the re-enrollment, *id.* ¶¶ 17-20. This report, among other things, discussed M.D.'s diagnosed Selective Mutism, anxiety, and speech delay. Two weeks later, around April 26, Colonial's supervisor of special education requested, and Parents granted, permission to observe M.D. at her private school. *Id.* ¶ 24.

Colonial sent Parents a Permission to Evaluate (PTE) form on May 9, 2019, roughly a month after Parents had first requested an IEP from the district. Joint Stipulation ¶¶ 13, 27. Parents signed the form on May 17, but they did not check the box agreeing to proceed with the evaluation. Doc. No. 1-15. They gave assent to proceed on May 20. From this point, Colonial had 60 days to

---

[2]    The fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) classifies Selective Mutism as an anxiety disorder characterized by a consistent inability to speak. Highlights of Changes From DSM-IV to DSM-5, Diagnostic & Statistical Manual of Mental Disorders, 5th ed. ApxH1.

re-evaluate M.D. Because summer vacation days are excluded from the 60-day timeline, 22 Pa. Code § 14.123(b), Colonial theoretically did not have to complete the re-evaluation until September 27, 2019. *Id.*

Parents corresponded with Colonial throughout the summer inquiring as to the status of the IEP, including providing additional reports from clinical evaluations of M.D. Joint Stipulation ¶¶ 30-41. They also informed Colonial that M.D. had been accepted into AIM Academy, a private school, and that they were considering that option. However, tuition at AIM was cost-prohibitive, so Parents were open to a cost-sharing agreement. Doc. No. 1-14 at 8. In June, Colonial offered to set up a meeting with Parents to discuss what accommodations would be available to M.D but Parents declined when they learned that these meetings would not be a formal IEP meeting. Doc. No. 1-13 at 3, 5. Over the summer, Colonial advised Parents that it would not convene a formal IEP meeting until it completed its re-evaluation. Doc. No. 10-4 ¶¶ 14-15.

Colonial initially described the process as a "re-evaluation" of M.D., following which the school "will definitely move forward with the IEP and convene the IEP team." Doc. No. 1-14 at 10. On August 19, 2019, with the re-evaluation still outstanding and no IEP offered, Parents sent Colonial a ten-day notice of their intent to place M.D. in private school and to seek tuition reimbursement. Joint Stipulation ¶ 39. Colonial offered again to set up a meeting to discuss transitioning M.D. to the district the last week of August. Doc. No. 1-15 at 1. There is no evidence any such meeting took place. Amid this August correspondence, Colonial revised its tenor, describing, for the first time, the process not as a re-evaluation but an initial evaluation to determine M.D.'s eligibility. Doc. No. 1-15 at 1 ("[I]f [she] is eligible, [Colonial will] develop an IEP based on her needs.").

Colonial released its report on September 27, 2019. *Id.* ¶¶ 43-44; Doc. 1-16. It later sent a proposed IEP on October 29, 2019, by which time M.D. was enrolled at AIM Academy.

5

## PROCEDURAL HISTORY

### I.     The Hearing Officer's Decision

The parties submitted cross-motions for summary judgment to the hearing officer on the

sole issue of whether M.D. was denied a FAPE.  The hearing officer, noting the unusual procedural

posture of the matter, did not conduct an evidentiary hearing.  Instead, he found on the stipulated

record that Colonial did not deny M.D. a FAPE under the IDEA.  This was so, according to the

hearing officer, even though Colonial did not offer M.D. an IEP at the start of the 2019-20 school

year.  He concluded that the record lacked any evidence that a procedural violation of the IDEA

rose to the level of a substantive one.  Doc. No. 1-4.[3]  Because he found no substantive deprivation,

the hearing officer did not reach the question of whether AIM Academy was an appropriate

placement for her.

The parties then submitted cross-motions for partial summary judgment as to whether

Colonial discriminated against M.D. under § 504 of the Rehabilitation Act.  The hearing officer

found that Colonial had not discriminated against her so she could not state a § 504 claim.

Based on these rulings, the hearing officer issued a final order dismissing the due process

complaint and denying all relief under the IDEA and § 504.

### II.    Procedural History Since the Hearing

Parents filed their federal complaint challenging both of the hearing officer's rulings.  They

seek tuition reimbursement, and attorneys' fees and costs.  The parties have filed cross-motions

for judgment on the administrative record.  Doc Nos. 10, 11.  The Court granted the parties'

stipulation to supplement the administrative record with additional evidence relating to M.D.'s

placement at AIM.  Doc. No. 7.

---

[3]      The decision deliberately did not include analysis or case law.  Indeed, the hearing officer noted he
specifically disregarded the "large number of cases in [the parties'] briefs [because] none of the cases are
on point given the highly unusual set of facts in this case."  Doc. No. 10-6 at 14.

6

**LEGAL STANDARDS**

When reviewing IDEA cases, district courts conduct a modified *de novo* review. *S.H. v. State-Operated Sch. Dist. Of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). Any legal determinations by the administrative decisionmaker are reviewed *de novo*. The Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c). For this reason, judicial review in an IDEA case is "much broader" than review in other agency actions and differs from the traditional inquiry into genuine issues of material fact. *Colonial Sch. Dist. v. G.K. by & through A.K.*, No. CV 17-3377, 2018 WL 2010915, at *1 (E.D. Pa. Apr. 30, 2018), *aff'd*, 763 F. App'x 192 (3d Cir. 2019); *Mary Courtney T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 241 (3d Cir. 2009).

**DISCUSSION**

M.D.'s parents seek tuition reimbursement for her education at AIM Academy. To determine whether parents are entitled to reimbursement for their unilateral placement of a student in a private school, the Court applies the three-part *Burlington-Carter* test. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985); *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993). The party seeking relief must show (1) the public school did not provide a FAPE; (2) placement in the private school was proper; and (3) the equities weigh in favor of reimbursementParents contend that they have met their burden as to all three elements of the test.

At its core, this case is another example of the challenges of navigating the IDEA with inflexible parties. The IDEA's purposes are best fulfilled when parties are willing to work with each other. The statute and implementing regulations provide guardrails. They are not intended as drawbridges denying a student entry.

7

## I.    Whether M.D. Was Denied a FAPE

A school district denies a student a FAPE when the IEP is not appropriate or when there has been an actionable procedural violation. The first alternative is not relevant here. Indeed, Parents did not take issue with the substance of the IEP. Rather, they point to the lack of one offered. So, the question here is whether there was a procedural violation that rose to the level of an actionable substantive violation.

### A.  Whether There Was a Procedural Violation

Colonial seeks to frame this dispute as an unjustified indictment on its professional judgment and role in evaluating its students and preparing IEPs. In that regard, the Court recognizes the difficult challenges facing public education professionals. The IDEA recognizes that state and local educational agencies—in consultation with the child's parents or guardian— are responsible for best formulating an educational plan suitable for that child. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 207 (1982). And a suitable plan entails understanding the particular child's needs and evaluating her to craft a plan. But Colonial's preferred framing for the case misses what is actually in dispute. The concern motivating this case is whether Colonial has crafted a pocket-veto mechanism for itself by which to deny an eligible student her IEP rights by delaying them.

As a threshold matter, Colonial disputes whether the lack of an IEP at the start of the school year even constitutes a procedural violation of the IDEA. The IDEA requires that an IEP be in effect for an IDEA-eligible child at the start of the academic school year. 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323. No such IEP for M.D. was in place in September 2019. Doc. No. 1-4 at 11.

So, the Court must first determine whether M.D. was an eligible student within the meaning of the IDEA at the time she was re-enrolled in the district. Colonial effectively de-identified M.D.

8

as eligible for services under the IDEA, admitting as much during oral argument. It points to her unilateral placement in private school for two years and the change in diagnoses during that period. Its position, which the hearing officer endorsed, was that it was proper to have treated M.D. as a "new" student whose threshold eligibility to receive services needed to be determined. Because Colonial's position is that it had not recognized M.D. as eligible under the Act, it argues it was not obligated to have an IEP in place when school resumed.[4]

The Court cannot agree with the hearing officer that there was no procedural violation. The Court begins, as always, with the language of the IDEA. *Gibson v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 182, 186 (3d Cir. Apr. 8, 2021). Its interpretation of any particular provision is guided by an understanding of the entire statutory scheme and the congressional intent for this legislation. *SimmsParris v. Countrywide Fin. Corp.*, 652 F.3d 355, 358 (3d Cir. 2011).

Colonial justifies its conduct on the grounds that M.D. lost her eligibility under the IDEA due to her unilateral private placement. However, the plain text of the IDEA simply does not support this de-eligibility theory. Neither the IDEA nor Pennsylvania's implementing regulations specify how long a determination of eligibility lasts. But the Act provides that a child who has been found eligible (i.e., the child is determined to have a disability) remains eligible *until* a subsequent evaluation deems her ineligible. 20 U.S.C. § 1414(c)(5)(A); 300 C.F.R. § 300.305(e)(1); *Wimbish v. D.C.*, 381 F. Supp. 3d 22, 27 (D.D.C. 2019) ("A school district must not decide that the child is ineligible for special education services without conducting a re-evaluation."). Unless that evaluation finds otherwise, the status quo is preserved. There is no expiration date. The exceptions to this general rule are when the child graduates with a diploma or ages out of special education—neither of which are applicable here. 20 U.S.C. § 1414(c)(5)(B).

---

[4]     Although not dispositive to its decision, the Court has the benefit of reviewing Colonial's evaluation report, which confirms that M.D. has a disability, is eligible for special education, and requires extensive supports—an undeniable acknowledgement that it was necessary than an IEP be offered to her.

Colonial determined M.D. had a disability in 2016 and was eligible under the IDEA. And Colonial does not dispute that M.D. was within the three-year re-evaluation period. 34 C.F.R. § 300.303(B)(2). So, based on the unambiguous language in the IDEA, M.D.'s enrollment in private school did not somehow erase the finding that she was eligible for special education. Under the statute, an evaluation would first be necessary to *remove* eligibility rather than establish it in the first place. M.D. continued to be a "child with a disability" while she was in private school and when she re-enrolled in Colonial's district school in 2019. By subjecting her to an initial eligibility determination in 2019 under 34 C.F.R. § 300.301 and 22 Pa. Code. § 14.123, Colonial flipped the eligibility default on its head. But while engaging in this sleight of hand, Colonial does not point to any exception in the Act for a child who transfers back to a public school or whose IEP had expired in the interim. *See, e.g.*, *Reg'l Sch. Unit 51 v. Doe*, 920 F. Supp. 2d 168, 201 (D. Me. 2013) (child previously found eligible under the IDEA who re-enrolled in public school was entitled to IEP at start of school year). And the Court is not aware of any such authority.

To be sure, Parents' unilateral decision to place M.D. in a private school in 2017 suspended Colonial's obligation to continuously provide her an IEP (including special education and related services) for the months that she was not enrolled in the district school. *D.P. ex rel. Maria P. v. Council Rock Sch. Dist.*, 482 F. App'x 669, 672 (3d Cir. 2012) (citing 20 U.S.C. § 1412(a)(10)(A)(i)). But that is a separate matter, distinct from the District terminating her eligibility within the meaning of the IDEA. *L.G. ex rel. E.G. v. Wissahickon Sch. Dist.*, Nos. 06–0333, 06–3816, 2011 WL 13572, at *11 (E.D. Pa. Jan. 4, 2011).

Having canvassed the universe of case law within this Circuit addressing when a school's obligations under the IDEA, including an offer of an IEP, are once again triggered, the Court notes that most recently, the Third Circuit Court of Appeals re-affirmed that these obligations are reactivated either when parents objectively manifest an intent to re-enroll in public school *or*

request an evaluation. *A.B. through Katina B. v. Abington Sch. Dist.*, 841 F. App'x 392, 396 (3d Cir. Jan. 8, 2021); *see also D.P.*, 482 F. App'x at 673; *I.* The Court finds that threshold was satisfied here. Parents re-enrolled M.D. in the district on April 10, 2019 and requested an IEP that very day. The Court cannot conceive of a more objective manifestation of desire. In this respect, Colonial's reliance on case law where parents did not notify the school of any intent to enroll in public school is irrelevant.

So, Colonial erred in characterizing M.D.'s re-enrollment as prompting an initial evaluation, rather than a re-evaluation. *Compare* 300 C.F.R. §§ 300.301, 304 *and* 22 Pa. Code § 14.123 *with* 300 C.F.R. §§ 300.303 *and* 22 Pa. Code § 14.124. And Colonial does not point to anything that supports its resetting M.D. to the initial evaluation stage upon her re-enrollment. Moreover, its determination that M.D. should be evaluated did not suspend its obligation to develop and implement an IEP upon her re-enrollment. *L.G.*, 2011 WL 13572, at *11.

A school cannot begin a re-evaluation absent informed parental consent. 20 U.S.C. § 1414(c)(3); 34 C.F.R. § 300.300(c)(1)(i); *M.C by & through Conyers v. Sch. Dist. of Phila.*, No. CV 19-520, 2020 WL 4903790, at *9 (E.D. Pa. Aug. 20, 2020). In Pennsylvania, schools obtain such consent via permission to evaluate/re-evaluate forms, which they must make "readily available" once parents so request. 22 Pa. Code. § 14.123(c).

At oral argument, Colonial tried to make much of the fact that Parents did not explicitly request a re-evaluation, essentially failing to utter the "magic words." Colonial's argument is muddled on this point. That is because, in its briefing and in the record, Colonial seems to treat the re-evaluation as one requested by Parents, rather than a decision taken by Colonial.[5]

---

[5]        The record evidence shows that Colonial treated Parents' re-enrollment and request for an IEP as synonymous with such a request. In the permission to evaluate form, Colonial notes it was *Parents* who requested the evaluation. Doc. No. 1-11 ("[P]arents are requesting this evaluation in preparation for her transition back to the Colonial School District."). Colonial's evaluation report likewise states that Parents

11

Colonial could hardly be seen as having been misled by Parents.  Of its own volition, Colonial did not send Parents its permission to evaluate form until the middle of May, by which time it would not need to complete the re-evaluation before the school year ended.  But regardless of which party instigated the process, Colonial does not cite any authority for the proposition that the period to re-evaluate, as set by the state, excuses a school from having in place an IEP at the start of the school year, as required by the IDEA.

There is little case law discussing state implementing regulations for evaluations in the context of the IDEA's reasonable timeliness requirement.  The Third Circuit Court of Appeals has yet to directly address the interplay between compliance with Pennsylvania regulations and the IDEA's requirements.  Absent unambiguous appellate direction here in this Circuit, the Court shares the observations of the Ninth Circuit that a state's evaluation timeline does not provide "school districts with a safe-harbor under the applicable statute." *J.G. v. Douglas Cty. Sch. Dist.*, 552 F.3d 786, 798 (9th Cir. 2008).  The re-evaluation cannot begin unless and until parents consent, which is contingent on the school's transmittal of a permission form—a trigger that the school alone pulls.

Moreover, at least one court within this Circuit found that a three-month delay before beginning the re-evaluation process was an "inappropriate delay." *Brandywine Heights Area Sch. Dist. v. B.M. by & through B.M.*, 248 F. Supp. 3d 618, 631 (E.D. Pa. 2017) (finding that unreasonable delay entitled student to award of compensatory education); *accord A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, No. 1:13-CV-2379, 2015 WL 390864, at *12-13 (M.D. Pa. Jan. 28, 2015) (finding that school "failed to take necessary first step in this cooperative process:  the issuance of a PTE" and "unreasonably delayed the evaluation process").  As would have been true

---

requested "an assessment of M.D." in April 2019.  Doc. No. 1-16 at 4.  Based on Colonial's admissions, it was on notice as early as April that Parents desired a re-evaluation.

in *Brandywine*, had the district timely commenced its evaluation, a new IEP could have been in place for the start of school. So too here.

Under the circumstances, the Court finds Colonial's delay was of its own making and was inappropriate. This is especially so given that Colonial's own justification for its need to re-evaluate was the "profound change[s] in M.D.'s circumstance." Doc. No. 11-1 at 14. Taking Colonial's explanation at face value, its concern for M.D.'s additional diagnoses should have made all the more pressing the need to promptly conclude any evaluation and timely offer an IEP. But that was not done. The Court is not persuaded by Colonial's abstractions in the face of the record here. In other words, Colonial may not use the re-evaluation process both as a sword and a shield.

The Court appreciates Colonial's concerns that it needed to evaluate M.D. itself.[6] But, to do so, a school is first obligated to make a consent form "readily available" for parents, 22 Pa. Code. § 14.123(c), which it did not do here. And, until and unless a re-evaluation found M.D. *ineligible* under the IDEA, Colonial was still obligated to have an IEP in place come September 2019. 20 U.S.C. § 1414(d)(2)(A). Colonial has cited to no statutory authority that says otherwise. It is this series of events that leads the Court to find there was, at minimum, a procedural violation.

## B. Whether the Procedural Violation of the IDEA was Substantive Denial of a FAPE

Nonetheless, a procedural violation is not a *per se* denial of a FAPE. A school's compliance with the IDEA "primarily is significant because of the requirements' impact on students' and parents' substantive rights." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010).

---

[6]     There is a disingenuous framing to Colonial's arguments that is belied by the record. According to Colonial, the only question for the Court to resolve is whether it is compelled to develop an IEP based on outdated information and reports. Doc. No. 11-1 at 8. And it simultaneously attacks the qualifications of Parents' experts. But it cannot ignore the fact that its own report extensively cites to and relies upon those same experts. Indeed, Colonial admits that "all cognitive and academic assessments were conducted by [Parents' expert] as part of a private evaluation." Doc. No. 1-16 at 16.

For a procedural violation of the IDEA to justify compensatory education or tuition reimbursement, the parents must prove by a preponderance of the evidence that "procedural inadequacies (i) [i]mpeded the child's right to a FAPE, (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit." *Colonial Sch. Dist. v. N.S.*, No. CV 19-1311, 2020 WL 1517562, at *10 (E.D. Pa. Mar. 30, 2020) (internal citations omitted); *see also C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 68 (3d Cir. 2010) (citing 34 C.F.R. § 300.513(a)(2)(i), (iii)).

When it became apparent that no IEP would be offered by the start of school, Parents provided the requisite ten-day notice to Colonial that they would enroll M.D. in private school. Parents contend that the failure to offer an IEP at the start of the school year was a substantive violation. The hearing officer disagreed. Doc. No. 10-6 at 11. Instead, he summarily concluded that there was no denial of a FAPE and there was no evidence that M.D. was deprived of an educational benefit. *Id.* at 11.[7]

The Third Circuit Court of Appeals has expressly declined to hold as a matter of law that any specific period of time without an IEP is a denial of a FAPE, absent specific evidence of an educational deprivation.[8] *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 69 (3d Cir. 2010).

---

[7]     The hearing officer's entire discussion on this matter is this single sentence in the Order: "The hearing officer's independent review of the stipulated record also did not reveal evidence of any deprivation of educational benefit or serious impairment of participation rights." Doc. No. 10-6 at 11. His findings are otherwise unexplained.

[8]     Other circuits have found lengthy delays in implementing an IEP do give rise to a substantive violation. *See Leggett v. D.C.*, 793 F.3d 59, 67 (D.C. Cir. 2015) (delay between two weeks and a month was substantive denial); *Tice v. Botetourt Cty. Sch. Bd.,* 908 F.2d 1200, 1207 (4th Cir. 1990) (six months); *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764, 766–67 (6th Cir. 2001) (no IEP for entire school year); *Myles S. v. Montgomery Cty. Bd. of Educ.,* 824 F. Supp. 1549, 1555 (M.D. Ala. 1993) (two-week delay was not denial of substantial educational benefit).

Indeed, there is very little case law to guide the Court's inquiry, particularly where, as here, the re-evaluation of the student was pending when school started.

    To move the needle from a *de minimis* violation to an outright denial of a FAPE requires showing that M.D. suffered a loss of educational opportunity. The Third Circuit Court of Appeals held in *Cape Henlopen* that there was no substantive rights violation. *Id.* There and here, the schools failed to have an IEP in place, which led parents to enroll their children in private schools. However, two—arguably dispositive—differences between *Cape Henlopen* and the facts here suggest that the same result should not hold.

    *First*, the appellate court emphasized that it would not hold a school "liable for procedural violations *that are thrust* upon it by uncooperative parents." *Id.* (emphasis added). Multiple scheduling conflicts by C.H.'s parents in *Cape Henlopen* prevented finalizing the IEP until after the first day of classes. The parents also refused to give the district permission to evaluate C.H., which was necessary to develop the IEP. *Id.* at 63-64. Indeed, the Third Circuit Court of Appeals has emphasized in subsequent cases that the result in *Cape Henlopen* stems from the "parents' decision to delay an IEP team meeting until after classes had begun." *Upper Freehold Reg'l Bd. of Educ. v. T.W.*, 496 F. App'x 238, 243 (3d Cir. 2012). That dispositive fact is starkly missing here.

    Here, it is undisputed that Colonial did not convene an IEP meeting before the start of the school year. Doc. No. 1-13 at 3 . Parents reached out to Colonial on June 5 to inquire about when the parties would meet for an IEP meeting. *Id.* They also provided various reports to Colonial, including from a speech and language pathologist who had evaluated M.D. Based on a review of the record, there is not the same sort of intransigence or lack of cooperation by Parents here as in *Cape Henlopen.* To be sure, Parents opted not to meet with Colonial in June once the school made

it clear that the meeting was not a formal IEP meeting. But there is a marked difference between cooperating informally (i.e., to discuss § 504 supports) and participating in the IEP process.

*Second*, the appellate court in *Cape Henlopen* credited the hearing panel's finding that an "IEP could have been developed for C.H. within a week of the start of the school year, had C.H. remained in the District and had the Parents continued to cooperate." 606 F.3d at 69. Neither the hearing officer nor the district court credited the parent's presumption that the "District's failure to have the IEP in place on the first day would deprive C.H. of an educational benefit." *Id.* By contrast, here Colonial clearly communicated that an "evaluation report"[9] would not be released until the end of September and the IEP would take another month to prepare. So, there were at least seven more weeks that M.D. would have been without an IEP as compared to C.H. in *Cape Henlopen* had both remained in the district school.

Here, the hearing officer declined to hold an evidentiary hearing. Thus, the Court is without the benefit of knowing whether he would have credited Parents' concerns. But the parties have stipulated to the supplemented record before the Court,[10] which plainly establishes that Colonial did not intend to expedite any evaluation before the 60-day timeline (even accounting for the summer holidays), nor would it offer an IEP before the end of October. The Court need not speculate on this "essential element." *Id.* Based on the undisputed record, M.D. faced at least seven weeks in a district school without any IEP.

Colonial emphasizes that it could not yet possibly offer an IEP "in time" because it needed to determine M.D.'s eligibility. But as the Court explains above, the operative presumption was

---

[9]     Colonial shifted from referring to the process as a "re-evaluation" in June to an "evaluation" later in the summer.

[10]     Despite the unusual procedural posture of this case, the parties affirmed their mutual preference at oral argument that the Court not remand to the hearing officer for an evidentiary hearing.

16

in favor of continued eligibility. *See* Section I.A, *supra.* So, the Court cannot agree with Colonial's defense that it had to first determine whether she was eligible to receive *any* services under the IDEA. The question now was the impact of *additional* diagnoses. Clearly, it was known to all that M.D. might need more supports, not less.

Colonial's position devolves to "no IEP is better than an imperfect IEP." Neither are desirable outcomes. Nor can or will the Court endorse requiring Parents to send M.D. to Colonial for at least the first two months of the school year without an IEP merely to preserve a right to tuition reimbursement. In a similar context, at least one district court in this Circuit has described this as a "Hobson's choice" and noted that it would "strain credulity" to think that this was Congress' intent. *A.Z. ex rel. M.Z. v. Mahwah Twp. Bd. of Educ.*, No. CIV.A. 04-4003 (KSH), 2006 WL 827791, at *6 (D.N.J. Mar. 30, 2006).

On these facts, the Court rejects the hearing officer's cursory finding that M.D. was not deprived of a FAPE.

**C.  Whether AIM was Appropriate Placement for M.D.**

Because the hearing officer determined that M.D. was not denied a FAPE, he did not reach the issue of whether the private school M.D. currently attends is a suitable placement for her. A finding that the private school is appropriate is a prerequisite to recovery for tuition reimbursement. *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359, 369-70 (1985). The parties stipulated to expanding the record to include new evidence which purports to support Parents' claim that M.D. is succeeding in her current private school environment. At oral argument, the parties acknowledged the Court's authority to determine that a private school placement is proper. That is the Court's role here when the hearing officer has declined to reach the second prong of the *Burlington-Carter* test.

17

Colonial argues that AIM is not a proper placement for M.D. because it does not meet her particular needs. Private school placement does not need to meet the IDEA standard of a FAPE that applies to Colonial and other public schools. It need only be "reasonably calculated to enable the child to receive educational benefits." *Florence Cty. Sch. Dist. Four. v. Carter*, 510 U.S. 7, 11 (1993). Colonial faults Parents for failing to document a "structured plan of interventions" to address M.D.'s Selective Mutism and anxiety or otherwise provide information of a "specialized nature." Doc. No. 11-1 at 21. Colonial also takes aim at M.D.'s treating doctor, arguing that he "has no evident educational credential." *Id.*

The Court is not persuaded by Colonial's arguments. On the supplemented record, the Court has sufficient evidence to find that AIM is an appropriate placement. Parents selected this school upon consultation with M.D.'s doctors at the Smart Center. AIM administered a battery of assessments prior to admitting M.D. as a student. Given M.D.'s diagnosed anxieties and Selective Mutism, the evidence shows AIM has structured a learning environment to assist M.D. in communicating and to encourage her participation in class. M.D. also receives occupational therapy at AIM, Doc. No. 10-4, and her teachers have reported that M.D. has benefitted from these sessions, remarking on M.D.'s improved self-regulation and self-monitoring. Her doctor opined in his declaration that "AIM has been an ideal education placement for [her] and that she will likely succeed if she remains enrolled there." Doc. No. 10-5 at 40.

Based on the supplemental administrative record and given the less onerous showing that Parents must make at this point in the process, the Court finds that AIM is an appropriate private placement for M.D.

**D. Tuition Reimbursement**

Colonial seeks an order that Parents are not entitled to any tuition reimbursement. Parents request tuition for the 2019-20 and 2020-21 school years, which amounts to approximately $80,000.

Once a court holds that the school violated the IDEA, it enjoys broad discretion to fashion appropriate relief. *Carter*, 510 U.S. at 15-16. This includes ordering retroactive tuition reimbursement for the cost of the alternate enrollment. 20 U.S.C. § 1412(a)(10)(C)(ii). The Court must consider all "relevant factors, including the appropriate and reasonable level of reimbursement that should be required." *Carter*, 540 U.S. at 16. Congress likewise authorized courts to reduce or eliminate reimbursement when Parents take unreasonable actions. 20 U.S.C. § 1412(a)(10)(C)(ii)(III).

Typically, tuition reimbursement is awarded as of the date that parents notify the school of their dissatisfaction, such as when they reject an IEP and enroll their child in a private school. This is the "unusual context where the child was already attending a private school when the district denied [her] a FAPE." *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1084 (D.N.J. 2011). In this situation, courts have calculated tuition from the point at which the school *should* have acted (i.e., here by providing M.D. an IEP). *Id.* Colonial was put on notice of M.D.'s request for a FAPE in early April 2019, when it learned that Parents had requested an IEP. Had it timely acted, it surely would have completed its re-evaluation before the end of the spring and offered M.D. an IEP.

However, the Court in its equitable discretion will not award full tuition reimbursement to Parents. The Court is cognizant of Parents' initial offer to enter into a cost-sharing arrangement with the school. Moreover, although Colonial did complete its re-evaluation and ultimately offer an IEP in October 2019, there is no evidence that Parents then or at any time since engaged in any

sort of "cooperative process" with Colonial. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). Even when the school has failed to have an IEP in place at the start of the school year, Parents are not relieved of their obligations to "cooperate and assist in the formulation of an IEP." *Cape Henlopen*, 606 F.3d at 72 (affirming denial of tuition reimbursement when parents refused to continue with IEP development or permit evaluation of child). The absence of an IEP, which is the core of this dispute, does not excuse Parents "from continuing to meet with the District to rectify the perceived wrong." *Id.* In short, Parents are obliged to continue to try to be reasonable for the child's benefit as envisioned by the IDEA.

Accordingly, the Court declines to award the full tuition reimbursement for the two school years and reduces the award to a single year.

## II.    M.D.'s Section 504 Claim

Section 504 ensures "nondiscriminatory access to public institutions." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 756 (2017). Its protections are broader than those under the IDEA with the intent of rooting out disability-based discrimination against people of all ages, not just students. The requirements to find a § 504 violation are less onerous than those under the IDEA. In the context of schooling, § 504 also carries a separate FAPE requirement.    34 C.F.R. § 104.33(a). Consistent with its obligations under § 504, a school "must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 280 (3d Cir. 2012).

Although a "party may use the same conduct as the basis for claims under the IDEA and [Section 504]," Parents must still prove there was a violation of § 504. *Andrew M. v. Del. Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007). To establish a violation of Section 504, Parents must prove that (1) M.D. is disabled as defined by the Act; (2)

she is otherwise qualified to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) M.D. was excluded from participation in, denied the benefits of, or subject to discrimination at, the school.

The hearing officer found that Parents established the first three factors of a § 504 claim. Doc. No. 10-6 at 19. But he denied their claim because he found "no specific discrimination or failure to accommodate is alleged in the complaint." *Id.* at 20. He rejected Parents' argument that the failure to provide an IEP was a violation of § 504, for the same reason he rejected their IDEA claim. *K.D. by Theresa Dunn and Jonathan Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 256 (3d Cir. 2018) (Section 504 claims were a repackaging of those allegations underlying the IDEA claim).

The Court accepts the result reached by the hearing officer but does not endorse his reasoning. *See* Section I.B., *supra*.

Both parties fault the other for failing to speak "magic words." Colonial contends that Parents did not expressly make a written request for § 504 supports when they enrolled M.D. in April 2019. Doc. No. 1-7. To be sure, they did request an IEP at that time. But Parents left the § 504 support option blank (i.e., they did not circle "yes" or "no"). So, Colonial argues, Parents were not requesting accommodations for M.D. In response, Parents assert that Colonial never expressly mentioned § 504 to Parents, and instead discussed "supports available for regular education students." Doc. No. 12 at 13.

The Court, however, is troubled by Parents' repeated refusals to speak with Colonial about available supports for M.D., even when it was clear that Colonial would not offer an IEP in time. The record shows that Parents, on at least on two occasions, rejected Colonial's offers to discuss accommodations as the school year approached.

21

In early June, Colonial requested a meeting with Parents "as soon as possible to discuss what Colonial School District can provide for M.D." Doc. No. 1-13 at 5. Colonial offered to involve its director of pupil services, school psychologists, a speech and language therapist, and a special education teacher "as long as [everyone was] able to meet prior to the end of school." *Id.* When Colonial informed Parents that this would not be the formal IEP meeting, Parents declined to meet at all. *Id.* at 3.

In late August, Parents gave notice of their intention to enroll M.D. in a private school prior to the start of the 2019 academic year. In response, Colonial wrote that while the evaluation and IEP process was proceeding, it was ready to offer "supports" "to ensure that all work collaboratively for M.D. to have a successful start to the school year." Doc. No. 1-15. There is no evidence that Parents discussed available educational supports unless it was not in the context of a formal IEP meeting. To the contrary, Parents declined to meet with Colonial's support staff to discuss accommodations.

At most, Colonial committed another procedural violation of § 504's implementing regulations. Regardless of whether Parents or Colonial initiated the process to secure § 504 services, Pennsylvania requires the school district to provide written notice to the student's parents. 22 Pa. Code §§ 15.5, 15.6. There is no evidence in the record that Colonial prepared the requisite written notice.

In most circumstances, establishing a denial of a FAPE suffices to establish a § 504 claim. And, indeed, the Court has already found that Colonial's failure to have an IEP in place denied M.D. a FAPE. But there is no evidence in the record that Colonial failed to reasonably accommodate M.D. Parents essentially ask the Court to speculate that, had they attended a meeting with Colonial, M.D. would have still "have to start the school year without any individual accommodations." Doc. No. 10-5 at 33. But there is nothing in the record to substantiate this

22

assumption. And the Court declines to do so here.[11] To be clear, the Court distinguishes Parents' lack of cooperation during the IEP process from the parents in *Cape Henlopen*, in finding that M.D.'s rights under the IDEA were substantively violated. *See* Section I.B., *supra*. But insofar as they base their § 504 claim on a substantive violation, Parents' documented refusals to meet with Colonial throughout the summer to discuss whatever § 504 accommodations were available doom this claim.

Accordingly, the Court affirms the hearing officer's finding that M.D. was not denied a FAPE under § 504.

## III.   Attorneys' Fees

Parents request attorneys' fees and costs under both the IDEA and § 504. As a threshold matter, because Parents' § 504 claim fails, they are not entitled to those associated fees and costs. Parents' IDEA claim, however, has merit.

The IDEA grants courts the discretion to award "reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." *K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.*, 806 F. Supp. 2d 806, 830 (E.D. Pa. 2011) (citing 20 U.S.C. § 1415(i)(3)(B)). A "prevailing party" is one who succeeds "on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *John T. ex rel. Paul T. v. Del. Cty. Intermediate Unit*, 318 F.3d 545, 555 (3d Cir. 2003). The "touchstone" of the inquiry is the "material alteration of the legal relationship of the parties." *Id.* The Third Circuit Court of Appeals has interpreted the IDEA fee-shifting provision to "provide fees only to those who prevailed *with respect to an IDEA claim*." *Id.* at 560.

---

[11]     Parents also appear to confuse the overlapping—but still distinct—purposes of the IDEA and the Rehabilitation Act. Only students who have been determined eligible under the IDEA receive an IEP. But § 504 is not so restrictive. Moreover, because § 504 plans can be implemented on an as-needed basis, Colonial theoretically could have proposed a set of accommodations to bridge those first few months of the 2019-20 school year while it finalized the IEP.

Parents have successfully established that M.D. was denied a FAPE under the IDEA. *See* Section I, *supra*. This entitles them to prevailing party status under the IDEA and makes them eligible for an award of reasonable attorneys' fees. The Court directs the parties to submit supplemental briefing and documentation limited to Parents' reasonable attorneys' fees and costs as the prevailing party on their IDEA claim.

### CONCLUSION

For the reasons set out in this Memorandum, the Court vacates the decision and order in ODR File No. 23232/19-20AS finding that M.D. was not deprived of a FAPE under the IDEA and affirms the decision and order finding that M.D. was not denied a FAPE under § 504. So doing, the Court grants in part Colonial's motion for judgment on the administrative record as to Parents' IDEA claim and grants in part M.D.'s motion for judgment on the administrative record. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE